UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

BEAR CREEK CRANBERRY CO., LLC,              **REPORT AND**
                                                                     **RECOMMENDATION**
                                    Plaintiff,

v.                                                                      10-CV-00770(A)(M)

CLIFFSTAR CORPORATION,

                                    Defendant.
_____

## INTRODUCTION

Before me are motions for partial summary judgment by plaintiff Bear Creek Cranberry Co., LLC ("Bear Creek") [35][1] and defendant Cliffstar Corporation ("Cliffstar") [42]. Those motions, being dispositive, have been referred to me by District Judge Richard J. Arcara for preparation of a Report and Recommendation [27]. For the following reasons, I recommend that Bear Creek's motion be granted, and that Cliffstar's motion be denied.

## BACKGROUND

In April 2008, the parties entered into a "Cranberry Marketing Agreement" ("Agreement"), with an Addendum, calling for the sale of cranberries by Bear Creek to Cliffstar under certain terms and conditions. Shaw Declaration [37-1], Ex. A. Under §7(d) of the Agreement, Bear Creek represented and warranted that it was "in good standing under the laws of the State of Wisconsin". Section14(d) of the Agreement provides that an "Event of Default" occurs whenever "any representation or warranty of [Black Creek] . . . shall become untrue or incorrect in any respect", and §15 entitles Cliffstar, "[d]uring the continuance of any such Event

---

[1]        Bracketed references are to EM/ECF docket entries.

of Default . . . [to] terminate this Agreement by written notice to [Black Creek]". Whereas certain other "Events of Default" entitled Black Creek to notice and an opportunity to cure before termination (*e.g.*, §14(a)), no such right existed for breach of a representation and warranty under §7.

In June 2010, Cliffstar's Executive Vice President, Kevin Sanvidge, notified Bear Creek that "as indicated in the attached Certificate of Status from the Wisconsin Department of Financial Institutions . . . dated June 4, 2010, Bear Creek has failed to comply with the requirements of the Wisconsin Limited Liability Companies law and is therefore not in good standing in the State of Wisconsin. This breach constitutes an Event of Default as provided in Section 14(b) of the Agreement. Cliffstar Corporation is hereby exercising its right of termination pursuant to Section 15 of the Agreement on the basis of this Event of Default." Shaw Declaration [37-1], Ex. B. Accompanying that letter was a certificate dated June 4, 2010, executed by Ray Allen, Deputy Administrator, Division of Corporate and Consumer Services, Wisconsin Department of Financial Institutions ("DFI"), stating that Bear Creek "has not, within its most recently completed report year, filed an annual report as required under . . . 183.0120 Wis. Stats., but that it has not filed articles of dissolution." Id. The record does not indicate how or why Cliffstar obtained that certificate.

On June 14, 2010 Bear Creek filed its annual report with DFI. Shaw Declaration [37-1], ¶11. According to Ray Allen (the author of the June 4, 2010 certificate relied upon by Cliffstar), that filing was made within the one-year "grace period" allowed by Wis. Stats. 183.0925(1). Allen Declaration [37-1], Ex. 2, ¶2. He further stated that "the term 'good standing' is not defined in Chapter 183 of the Wis. Stats. or administrative rules relating to

limited liability companies and the Wisconsin Department of Financial Institutions . . . has never made a determination that Bear Creek . . . is not in good standing." Id., ¶5.

Citing DFI's website, which states that Bear Creek was "Delinquent" effective April 1, 2010 (Scherer Declaration [42-2], Ex. C) and "Restored to Good Standing" effective June 14, 2010 (id.), Cliffstar argues that "if Bear Creek was 'restored to good standing' . . . logically Bear Creek must have been NOT in good standing prior to the date it filed its annual report". Cliffstar's Memorandum of Law [42-3], p.7.

Bear Creek moves for summary judgment declaring that Cliffstar's termination of the Agreement was invalid, both because Cliffstar cannot show that Bear Creek was not in "good standing" at the time of the termination (Bear Creek's Brief [37], Point I) and because Bear Creek did not materially breach the Agreement (Id., Point II).  In addition, Bear Creek seeks dismissal of Cliffstar's counterclaim for return of interest payments which are due upon termination of the Agreement.  Id., Point III.  Cliffstar cross-moves for summary judgment declaring that its termination of the Agreement was proper, for judgment on its counterclaim seeking return of interest payments, and for judgment dismissing Bear Creek's fourth cause of action for underpayment for its 2008 crop.  Cliffstar's cross-motion [42], ¶¶1-3.

**ANALYSIS**

**A.    Validity of the Termination**

Bear Creek argues that Cliffstar was entitled to terminate the Agreement only for a material breach. Bear Creek's Brief [37], Point II. I disagree.  The Agreement clearly gives either party the right to terminate "during the continuance of *any* . . . Event of Default" by the

other (§15, emphasis added). Interpreting the right of termination to apply only to "material" defaults, rather than to "any" default, would in effect be rewriting the contract, which Wisconsin law does not alllow.[2] "A court may not use the mechanism of construction to review an unambiguous contract in order to relieve a party from any disadvantageous terms to which the party has agreed . . . . In short, a court may not rewrite a clear and unambiguous contract." Rosplock v. Rosplock, 217 Wis.2d 22, 31, 577 N.W.2d 32, 37 (Wis.App. 1998), review denied, 219 Wis.2d 922, 584 N.W.2d 123 (Wis. 1998). Therefore, if as a result of its failure to timely file its annual report, Bear Creek was not "in good standing under the laws of the State of Wisconsin", then Cliffstar was entitled to terminate the Agreement regardless of the materiality of that failure.

It is undisputed that the phrase "good standing" is "not a defined term in the Cranberry Agreement or currently in Wisconsin law" (Cliffstar's Memorandum of Law [49], p.5), and the parties propose conflicting interpretations of the phrase. Bear Creek suggests that it means "that Bear Creek must be authorized to transact business in Wisconsin" (Bear Creek's Memorandum of Law [37], p.2), whereas Cliffstar contends that it instead refers to "whether the organization has timely filed all required periodic reports with the applicable jurisdiction and timely paid any applicable fees or taxes due in connection therewith". Sanvidge Declaration [42-2], ¶7.

"Although generally interpretation of ambiguous contract language is a question of fact to be resolved by the factfinder . . . the court may resolve ambiguity in contractual

---

[2] Section 18 of the Agreement states that it "shall be construed, interpreted and the rights of the parties determined in accordance with the laws of the State of Wisconsin".

language as a matter of law if the evidence presented about the parties' intended meaning is so one-sided that no reasonable person could decide the contrary." Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc., 232 F.3d 153, 158 (2d Cir. 2000). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Accordingly, in resolving these motions, I need not decide the meaning of the phrase "in good standing under the laws of the State of Wisconsin" as used in §7(d) of the Agreement. I need only decide whether it could possibly have the meaning advanced by Cliffstar as the basis for terminating the Agreement - namely, that Bear Creek had not timely filed its annual report.

Noting "that 'good standing' was once defined in Wisconsin corporate law using the very meaning Cliffstar has suggested" (Cliffstar's Memorandum of Law [49], p.6), Cliffstar argues that it is "reasonable to give the now undefined phrase its previous meaning, especially when it is consistent with corporate law across the nation". Id. There are two flaws in this argument. In the first place, although Wisconsin corporate law at one time equated "good standing" with the filing of an annual report,[3] "[t]hat version of Wisconsin law was repealed almost twenty years ago. The phrase 'good standing' has not appeared in Wisconsin corporations law since." Second Allen Declaration [45-1], ¶5(B). "Provisions in an obsolete and inoperative act which are omitted in another act relating to the same subject matter cannot be applied in a

---

[3] See former Wis. Stats. §180.793(3), stating that "[i]f the report is not filed during the calendar year quarter . . . the corporation shall not be in good standing." [37-1], App. 20.

proceeding under the other act because to do so would give effect to the inoperative act." State v. Gereaux, 114 Wis.2d 110, 113, 338 N.W.2d 118, 119 (Wis.App. 1983); 2B Sutherland Statutes and Statutory Construction, §51.4 (7th ed. 2010).

Secondly, Bear Creek is a limited liability company, not a corporation,[4] and "[t]he phrase 'good standing' has . . . never appeared in Wisconsin limited liability company law". Second Allen Declaration [45-1], ¶5(B). Therefore, the definition which Cliffstar proposes cannot be read into that statute. See Employers Mutual Fire Ins. Co. v. Haucke, 267 Wis. 72, 76, 64 N.W.2d 426, 428 (Wis.1954) ("To interpret it as respondent would have us do it would be necessary to add words to the statute to cover such meaning. This we cannot do"); Weston v. Wisconsin Dept. of Workforce Development, 304 Wis.2d 418, 443, 737 N.W.2d 74, 85 (Wis. App. 2007) ("DWD's interpretation of the applicable statutory provisions . . . adds words that are not there").

Cliffstar's reliance on the DFI website is likewise misplaced. In response to Bear Creek's argument that the website is inadmissible hearsay (Bear Creek's Reply Brief [44], pp.6-7), Cliffstar argues that the records "squarely fit within the Fed. R. Evid. 803(8) hearsay exception". Cliffstar's Memorandum of Law [49], p.4. However, Rule 803(8) makes clear that such records are *not* admissible where "the sources of information or other circumstances indicate lack of trustworthiness". Cliffstar argues that governmental websites "'are considered trustworthy due to the duty that comes with public service, and it is presumed that public officials

---

[4] "LLC . . . is the designation for a limited liability company, not a corporation . . . . Thus, if [plaintiff] is truly an LLC, it is not a corporation." Basler Turbo Conversions, LLC v. HCC Insurance Co., 2008 WL 4560635, *1 (E.D.Wis. 2008)

execute their tasks carefully and fairly.'" Id., p.5 (*quoting* Williams v. Long, 585 F. Supp.2d 679, 690 (D.Md. 2008)).

That argument is not persuasive in this case, since the DFI website contains a "Disclaimer of Warranties and Accuracy of Data", specifically stating that "no warranty express or implied is made or assumed regarding accuracy . . . reliability or usefulness of any such information [found on the site] . . . . Changes may from time to time be made to the information referred to on this website; these changes may or may not be incorporated into any new version of the website". Meiners Declaration [45-1], Ex. A.

According to DFI's Deputy Secretary, Ray Allen, "[t]he 'good standing' and 'restored to good standing' terminology appearing on the Department's website . . . is a relic from a now-repealed version of Wisconsin law once applicable to corporations . . . . and the Department is currently in the process of redesigning . . . its website to accurately reflect to the public the absence of any 'good standing' requirement in current Wisconsin law applicable to corporations and limited liability companies". Second Allen Declaration [45-1], ¶¶5(B),(C).

For these reasons, whatever the phrase "in good standing under the laws of the State of Wisconsin" may mean, it *cannot* have the meaning advanced by Cliffstar in terminating the Agreement. Therefore, Cliffstar's termination of the Agreement was invalid.


**B.     Interest Subsidy Payments**

Both parties also seek summary judgment concerning Cliffstar's counterclaim ([26], ¶¶66-73) for return of interest payments made to Bear Creek. The Addendum to the Agreement states that if the Agreement "is terminated early, all interest subsidies and advance

bonuses paid on delivered fruit must be repaid upon termination." Sanvidge Declaration [42-2], Ex. A. Since I have concluded that Cliffstar's termination of the Agreement was invalid, its counterclaim should be dismissed.

C.   **Payments for Bear Creek's 2008 Crop**

Cliffstar also seeks summary judgment dismissing Bear Creek's Fourth Claim (Complaint [1, Ex. A], ¶¶38-43) for underpayment for its 2008 cranberry crop. The Addendum to the Agreement (Sanvidge Declaration [42-2], Ex. A) provides that "the yearly base price will be established by matching the highest base price of any of the three other major handlers (Cranberries Unlimited, Clement-Pappas, and Ocean Spray A-Pool Cash Price)."[5]

Cliffstar paid Bear Creek $62.00 per barrel for its 2008 crop, whereas Bear Creek contends that Cranberries Limited paid a grower $83.00 for his 2008 crop, meaning that Cliffstar would have underpaid Bear Creek by $21.00 per barrel. Cliffstar's Memorandum of Law [42-3], p. 17. Cranberries Limited's Vice President of Finance, Andrea Weiland, has confirmed that "the average barrel price of cranberries that Cranberries Limited paid to its growers for the 2008 crop was $81.50 per barrel", and that "the highest barrel price for cranberries that Cranberries Limited paid to its growers for 2008 crops was $88.64 per barrel". Weiland Declaration [45-1], ¶¶ 3, 4.

In seeking dismissal of Bear Creek's underpayment claim, Cliffstar does not contend that Cranberries Limited did not make these payments. Instead, it argues that Bear Creek

---

[5]   It appears undisputed that the reference to "Cranberries Unlimited" "is a typographical error. The correct entity is Cranberries Limited." Cliffstar's Memorandum of Law [42-3], p. 17, n. 1.

did not furnish it with sufficient documentation so as to be entitled for further payment under the Addendum. Sanvidge Declaration [42-2], ¶¶14-17. "[I]n cases such as the present Cliffstar always requires that the grower provide formal documentation that substantiates the grower's claim that another major handler has been paid a higher base price." Id., ¶16.

What Cliffstar "always requires" of its growers is not determinative. The critical question is what the Agreement requires, and Cliffstar admits that the "Agreement is silent as to what type of notice or supporting documentation is required to be provided to Cliffstar to obligate it to pay the higher price". Cliffstar's Memorandum of Law [42-3], p.18. Cliffstar nevertheless argues "that this Court can make a determination as a matter of law that what was provided was insufficient". Id., pp.18-19.

For several reasons, I disagree. In the first place, it is not clear that the Agreement places *any* obligation upon Bear Creek to furnish Cliffstar with supporting documentation for its underpayment claim. As the drafter of the Agreement and Addendum, Cliffstar certainly could have included such a requirement had it wished, and even the authorities cited by Cliffstar recognize that "[a]mbiguous wording will be construed against the drafter provided the contract is also construed as a whole". Jones v. Jenkins 88 Wis.2d 712, 722, 277 N.W.2d 815, 819 (Wis. 1979); State Farm Mutual Auto. Insurance Co. v. Langridge, 275 Wis.2d 35, 47, 683 N.W.2d 75, 81 (Wis. 2004).

However, even assuming that it had an obligation to furnish Cliffstar with supporting documentation, Bear Creek has detailed its efforts to do so. *See* Shaw Second Declaration [45-2] and Bear Creek's Reply Brief [44], Point V. I find that these raise a genuine

issue of material fact as to whether Bear Creek satisfied its obligation - *if* it had one - to provide documentation supporting its claim for underpayment.

**CONCLUSION**

For these reasons, I recommend that Bear Creek's motion for partial summary judgment [35] be granted, and that Cliffstar's motion for partial summary judgment [42] be denied. Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the clerk of this court by May 23, 2011(applying the time frames set forth in Fed. R. Civ. P. 6(a)(1)(C), 6(d), and 72(b)(2)). Any requests for extension of this deadline must be made to Judge Arcara.  A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection . . . supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and

explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

DATED:      May 6, 2011

                                              /s/ Jeremiah J. McCarthy
                                              JEREMIAH J. MCCARTHY
                                              United States Magistrate Judge